**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES MICHAEL WILLIAMS,<br><br>                                    Petitioner,<br><br>v.<br><br>DANIEL PARAMO, Warden *et al.*,<br><br>                                    Respondents. | Case No.:  15-CV-2576-AJB(WVG)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: GRANTING LEAVE TO AMEND AND DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

James Michael Williams (hereinafter "Petitioner") is a state prisoner proceeding *pro se* and *in forma pauperis* with a Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  He challenges his San Diego Superior Court convictions for one count of forcible rape and two counts of forcible oral copulation, and his sentence of 150 years-to-life plus 18 years in state prison, enhanced due to a prior rape conviction. (Pet. at 1-2.)[1]  He claims his federal constitutional rights were violated by the admission at trial of evidence of the prior conviction (claim one), withholding of exculpatory and impeachment evidence by the prosecution (claim two), because the evidence is insufficient

---

[1]  All pleading citations are to page numbers as assigned by the Electronic Case Filing ("ECF") system.

to support the convictions (claim three), and due to ineffective assistance of trial counsel (claim four) and appellate counsel (claim five). (*Id.* at 6-10.)

Respondent has filed an Answer and lodged portions of the state court record. (ECF Nos. 28-29, 44.) Respondent argues that the state court adjudication of the claims in the Petition is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. (Memo. of P&A in Supp. of Answer ["Ans. Mem."] at 11-25.) Respondent argues that even if Petitioner could make such a showing, any errors are harmless because he had a fair trial, and that an evidentiary hearing is unnecessary because habeas relief is unavailable even assuming his allegations are true. (*Id.*; Answer at 3-4.)

Petitioner has filed a Traverse, supported by his declaration. (ECF No. 39.) He argues that the state court adjudication of the claims in the Petition is contrary to federal law, that the errors are not harmless, and that he is entitled to an evidentiary hearing. (Traverse at 1-10.) He has also filed a Proposed Amendment to the Petition. (ECF No. 43.) He claims that the use of the documents introduced at the bifurcated bench trial to prove his prior conviction violated federal principles of due process, confrontation, and double jeopardy, because (1) they are incomplete, improperly authenticated, and contain false statements; (2) they were not presented at his first trial, which ended with a hung jury; (3) he was not permitted to confront the person who certified the documents; and (4) they provide insufficient evidentiary support. (*Id.* at 31-63.)

Respondent has filed a Supplemental Answer to the Proposed Amendment to the Petition, and has lodged additional portions of the state court record. (ECF Nos. 50-51.) Respondent answers that the new claims are timely and exhausted, and Respondent does not object to amendment of the Petition to include them. (Suppl. Answer at 2-4.) Respondent argues that (1) the confrontation claim is procedurally defaulted due to Petitioner's failure to properly present it to the state court, and it can be denied because it is without merit; (2) the state court adjudication of the remaining claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law; and (3) any

errors are harmless because Petitioner received a fair trial. (*Id.* at 2-3; Memo. of P&A in Supp. of Suppl. Answer ["Suppl. Ans. Mem."] at 10-26.)

Petitioner has filed a Supplemental Traverse. (ECF No. 55.) He argues that the state court adjudication of the claims presented in the Proposed Amendment is contrary to federal law, that the errors are not harmless, his confrontation claim is not defaulted, and he is entitled to an evidentiary hearing. (Suppl. Traverse at 1-30.)

The Court recommends allowing Petitioner to amend his Petition to include the claims presented in the Proposed Amendment to the Petition, but finds that federal habeas relief is unavailable as to any claim presented in this action because the state court adjudication is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court alternately finds that even if Petitioner could satisfy that provision as to the claims presented in the Proposed Amendment to the Petition, any federal constitutional errors are harmless. The Court also finds that an evidentiary hearing is neither necessary nor warranted. The Court therefore recommends that leave to amend be granted and the Petition be denied.

## I.  PROCEDURAL BACKGROUND

In a five-count amended information filed in the San Diego County Superior Court on January 16, 2013, Petitioner was charged with forcible rape in violation of California Penal Code § 162(a)(2) (count one), two counts of forcible oral copulation in violation of Penal Code § 288a(c)(2)(A) (counts two and three), rape by a foreign object with the use of force in violation of Penal Code § 289(a) (count four), and false imprisonment by violence, menace, fraud or deceit in violation of Penal Code §§ 236 and 237(a) (count five). (Lodgment No. 2, Clerk's Transcript ["CT"] at 174-79 [ECF No. 29-6 at 45-50].) The amended information alleged, as to all counts, that Petitioner used a deadly weapon (a knife) within the meaning of Penal Code § 12022.3(a), and, as to counts one through four, that he used a deadly weapon or a firearm in violation of Penal Code §§ 12022, 12022.3, 12022.5 or 12022.53 within the meaning of Penal Code § 667.61(b)(c)(e). (*Id.*) It was also

alleged that he had been previously convicted of kidnapping and rape in Oklahoma in 1984 which qualified him as a habitual sexual offender within the meaning of Penal Code § 667.71(a), and that the prior Oklahoma conviction qualified as a prison prior, a serious felony prior, and a strike prior within the meaning of Penal Code §§ 667(a)(1) and (b), 667.5(b), 668, 1192.7(c) and 1170.12. (*Id.*)

Petitioner's first trial ended on March 2, 2012, with the jury deadlocked on all counts. (CT 321 [ECF No. 29-8 at 69].) On January 16, 2013, following a retrial, he was found guilty on counts one through three, with the jury returning a not true finding on the knife use allegation. (CT 248-50 [ECF No. 29-7 at 50-52].) A mistrial was declared as to counts four and five after the jury was unable to reach a verdict, and those counts were dismissed. (CT 331.01 [ECF No. 29-8 at 80].) In a bifurcated bench trial, the trial judge found the prior conviction allegations true, and found that the prior Oklahoma convictions constituted two strikes within the meaning of California's Three Strikes law.[2] (CT 344 [ECF No. 29-8 at 99].) On April 5, 2013, Petitioner was sentenced to consecutive terms of 25 years-to-life on each count, tripled as a result of the two strikes, consecutive terms of five years on each count for the habitual sexual offender finding, and consecutive one-year terms on each count for the prison prior, for a total term of 225 years-to-life plus 18 years. (CT 354 [ECF No. 29-8 at 103].)

Petitioner appealed, raising claim one presented here. (Lodgment Nos. 3-5.) On September 30, 2014, the appellate court affirmed in all respects except as to sentencing, finding that although the Oklahoma rape conviction constituted a strike, the Oklahoma kidnapping conviction did not because it was missing the asportation element required for kidnapping under California law, and remanded for resentencing. (Lodgment No. 6,

---

[2] The information was amended, over a defense objection, after the jury announced they had reached a verdict but before the verdicts were returned, to allege that the Oklahoma convictions for rape and kidnapping for rape, which arose from the same series of events, constituted two strikes rather than one as originally charged. (Lodgment No. 1, Reporter's Tr. ["RT"] at 981-85.)

*People v. Williams*, No. D063742, slip op. at 22 (Cal. Ct. App. Sept. 30, 2014).) Petitioner filed a petition for review in the state supreme court presenting claim one, which was summarily denied on December 10, 2014. (Lodgment Nos. 7-8.)

Petitioner was re-sentenced to 150 years-to-life plus 18 years, consisting of the same sentence with the exception that the three consecutive 25 years-to-life terms were doubled as a result of one strike rather than tripled as a result of two. (*See* Lodgment No. 9 at 2 [ECF No. 29-15 at 5].) Following resentencing, Petitioner's appointed appellate counsel filed an appellate brief pursuant to *People v. Wende*, 25 Cal. 3d 436 (1979) and *Anders v. California*, 386 U.S. 738 (1967), asking the court to independently review the record for arguable issues, and pointing out as potential claims (none of which are raised here) that the trial court abused its discretion in failing to disregard the strike, erred in imposing consecutive rather than concurrent sentences, erred in denying Petitioner a copy of his transcripts, and erred in imposing the 18-year enhancement. (*Id.* at 3-4 [ECF No. 29-15 at 6-7].) On July 30, 2015, Petitioner filed a *pro se* brief in support of the appeal after resentencing, in which he raised the claims he presents in his Proposed Amendment to the Petition here, which challenge the authentication and admission of the documentary evidence of his prior Oklahoma conviction. (Lodgment No. 16.) On October 5, 2015, the appellate court affirmed the new sentence in all respects. As to the claims raised by Petitioner in his *pro se* brief, the appellate court noted that they "were fully litigated" in his first appeal and "are not now properly before us." (Lodgment No. 10, *People v. Williams*, No. D067567, slip op. at 9 (Cal. Ct. App. Oct. 5, 2015).) On November 2, 2015, Petitioner presented the same claims in a *pro se* petition for review in the state supreme court. (Lodgment No. 17.) That petition was summarily denied on December 9, 2015. (Lodgment No. 11.)

On November 5, 2015, Petitioner filed a habeas petition in the state supreme court presenting claims two through five raised here. (Lodgment No. 12.) The petition was summarily denied on March 9, 2016. (Lodgment No. 13.)

## II.    UNDERLYING FACTS

Laurel B. testified that she grew up in the Ocean Beach area of San Diego where she attended high school, then moved to the San Francisco area where she received a Bachelor of Arts degree from San Francisco State University, and remained there after graduation working at a record store and living with her best friend and high school classmate, Stacy Antonel.  (RT 540-41.)  Laurel and Stacy eventually moved back to Ocean Beach, and on March 8, 2011, they walked from their home to the Sunshine Company bar about 10:00 p.m., where they joined a co-worker of Laurel and her friends.  (RT 541-43.)  Laurel was celebrating because it was Mardi Gras and because she had been working two jobs for some time and had just quit her second job as a restaurant hostess.  (RT 577.)

Laurel testified that she drank three beers and Stacy had two, when, at about closing time, they were approached by Petitioner who offered to buy them a drink.  (RT 544.)  Laurel, who was 26 years old, remarked about Petitioner, who was 62: "I didn't think he was hitting on me.  He's too old to think that."  (RT 545; CT 254-55 [ECF No. 29-8 at 2-3].)  She said Petitioner "was offering a business proposal.  He wanted me to model for a line of clothing that he told me he had."  (RT 545.)  He showed Laurel "a wad of cash" and said it was from his recent sale of a motorcycle jacket.  (*Id.*)  Petitioner bought her a drink of whiskey, at which point Laurel felt a little intoxicated but not drunk.  (*Id.*)

When the bar closed at 2:00 a.m., not long after they met Petitioner, Laurel stood outside smoking a cigarette talking with Stacy and Petitioner.  (RT 546.)  Petitioner, who was dressed "like a biker guy," continued talking to Laurel about modeling for his motorcycle clothing business.  (RT 546-47.)  He invited them to his RV, parked half a block away at the beach parking lot, and although Laurel said she did not feel alarmed or uncomfortable, she said she would not have gone without Stacy.  (RT 547-48.)  The three of them sat inside the RV where they drank whiskey, chatted, and discussed Petitioner's clothing line and the possibility of both women modeling for him.  (RT 548.)  He showed them a photograph of a UFO he had taken, which did not seem odd to Laurel because growing up in Ocean Beach she was used to encountering interesting people with unusual

beliefs.  (RT 583.)  About 3:30 or 4:00 a.m., Stacy announced that she wanted to go home, and Petitioner said he wanted to talk to Laurel alone.  (RT 550-51.)  Laurel said that she and Stacy were both comfortable leaving Laurel alone with Petitioner because they had come to trust him, and although he had told them that he had been in prison for kidnapping, Laurel believed him when he said he was innocent.  (*Id.*)

Laurel testified that she continued to drink whiskey after Stacy left, while Petitioner discussed the possibility of Laurel going on the road with him and taking care of the financial end of his business as she had done at the record store after college.  (RT 551.)  Up to this point Laurel said there had been no sexual element to their encounter, but then Petitioner kissed her, and she "consented for a second and then stopped the kiss" because she "didn't want to be kissing him."  (RT 551-53.)  She said she had not flirted with him or touched him, and she was not attracted to him.  (RT 553.)  Petitioner offered to take her anywhere in the world, and she thought he was wealthy.  (RT 553-56.)

They left in the RV to get breakfast, and Petitioner stopped after a couple of blocks at a gas station where he went in to buy cigarettes while Laurel stayed in the RV.  (RT 554-55.)  Rather than continue to a restaurant for breakfast, however, Petitioner drove back to the parking lot, at which point Laurel started to feel worried.  (RT 555.)  Laurel said that when they returned to the parking lot, Petitioner told her "he would give me $10,000 to lick my pussy."  (RT 558.)  She told him she was not interested in the offer, told him she wanted to go home, and began gathering her things, but he was standing between her and the door.  (*Id.*)  Petitioner told her she was not going home and he became aggressive for the first time, pushing her and preventing her from leaving.  (RT 559.)  He pulled something from a drawer which she thought was a knife, held it to her throat, and told her she was not leaving (count five-false imprisonment by violence, menace, fraud or deceit).  (*Id.*)  She was scared and thought he would hurt or kill her if she tried to leave.  (RT 559-60.)

Petitioner put the knife away and offered to allow her to leave, and she thought he had a change of heart, but when she started to leave he "punched my face with his fist . . . a few times."  (RT 561.)  He then told her to take off her clothes, and she undressed because

she thought he would hurt her if she refused.  (RT 561-62.)  He told her they could do it the easy way, which is to do as he says, or the hard way, where he would give her drugs to force her to comply, and she said "fine, give me whatever you want.  I don't want to feel this." (RT 564.)  He took out his penis and told her to put it in her mouth (count two-forced oral copulation), which she did only because she thought he would hurt her if she refused.  (RT 562.)  He repeatedly said he would allow her to leave if she wanted to, "hounding" her with the offer, but she believed it was the same trick he had used earlier and that he would hurt her if she tried to leave.  (RT 569.)  When she eventually relented and said she wanted to go home and started to go, he did not allow her to leave.  (*Id.*)

Petitioner then told her he was friendly with the Hell's Angels, and the first thing they were going to do in the morning is go to the Hell's Angels' headquarters where they would copy her driver's license so they would know her address.  (RT 563-64.)  He told her that everything they had discussed earlier was going to happen, that she "was going to be his girl, and we were going to go on the road together." (RT 564.)  When she said she would have to call her parents and Stacy, he told her exactly what to say to them, that she was taking a leave of absence from work because she had a great opportunity to model for Petitioner and they were not to worry.  (*Id.*)  She said she believed his threats about the Hell's Angels, but was not sure about the drugs as he never produced any, and said he made her drink the remaining whiskey, about half a cup.  (RT 564-65.)

Laurel said Petitioner then climbed in bed with her and asked what kind of sex she preferred, and she responded by saying she wanted to give him oral sex, explaining at trial that she felt it would be the least intrusive.  (RT 567.)  She performed oral sex on him (count three-forced oral copulation) while he penetrated her vagina with his fingers (count four-forced penetration with a foreign object), although she said she did not remember that last part very well.  (RT 567-68.)  She submitted not because she wanted to, but because, as with all the sex acts that night, she was afraid she would be hurt or killed if she refused.  (*Id.*)  Petitioner said he had a gun between the front seats of the RV, and that if she ever went to the police or looked at an officer funny while they were on the road he would slit

her throat, and she believed him.  (*Id.*)  Petitioner then inserted his penis in her vagina (count one-forcible rape), which she allowed because she was afraid of him.  (RT 568.)

Laurel said that when Petitioner fell asleep she got up to leave but was naked and could not find her clothes.  (RT 570-71.)  She put on his pants, her jacket and shoes, took her purse, and grabbed the wad of cash Petitioner had been flashing all night off a table as she left.  (RT 571-72.)  She explained at trial that it was a stupid decision to take the money, but at the time she was not thinking clearly and thought she "should get something out of this horrible experience."  (RT 572.)  She denied that the entire night had been a plan to steal Petitioner's money or that it was payment for prostitution.  (*Id.*)

Laurel ran home where Stacy called 911, and when the police did not arrive right away Laurel called 911 herself because she was afraid Petitioner would get away.  (*Id.*) The police took Laurel and Stacy to Petitioner's RV where they identified Petitioner and he was arrested.  (RT 573.)  Laurel said she realized at that point that she should tell the police about the money she had taken, and they returned home where the money was turned over to the police, with the exception of three dollars she turned over later.  (RT 573-74.) Laurel then submitted to a physical examination and said Petitioner never ejaculated and had difficulty maintaining an erection.  (*Id.*)  On cross-examination she clarified that she told the police about the money only after they asked her about it.  (RT 586.)

Stacy Antonel testified that she grew up in Ocean Beach and went to high school with Laurel B.  (RT 594.)  They lived together while Laurel attended San Francisco State University at the same time Stacy attended the University of California, Berkeley, where she obtained a degree in cultural anthropology.  (RT 594-95.)  Stacy testified that on the evening of May 8, 2011, she and Laurel were living together in Ocean Beach and walked to the Sunshine Company bar, arriving at 11:15 or 11:30 p.m., where they ran into Laurel's co-workers, and where Stacy had two beers and Laurel three.  (RT 595-96.)  Petitioner approached them near closing time wearing a leather jacket and black pants, holding a wad of money with hundred dollar bills on the outside, and offered to buy them a drink.  (RT 597.)  Stacy declined but Laurel allowed Petitioner to buy her a drink.  (*Id.*)  Stacy said she

was not "weirded out or freaked out" by Petitioner because he seemed to fit in with the eclectic type of people she was accustomed to seeing in Ocean Beach. (RT 598.)

When the bar closed, Petitioner invited them to his RV, which was parked nearby, and he told them he was interested in having Laurel model for his leather goods company. (RT 598.) Stacy said she did not want to go, but Laurel was intrigued by the opportunity to model and wanted to earn money, so Stacy went along in order to make sure Laurel was safe and to ensure Petitioner talked about that opportunity. (RT 599.) At the RV he poured them whiskey and told them about his family and his leather goods business, saying that there was a lack of fresh-faced youthful innocence in models these days, which is why he liked Laurel's look. (RT 600-02.) Stacy took one sip of whiskey and did not see Laurel drink any. (RT 601.) Petitioner seemed very knowledgeable about the business and genuinely interested in Laurel as a model, although Stacy thought the amount of money he claimed to make seemed exaggerated. (RT 602-03.) Petitioner told them that he had been involved in a robbery and had been caught, which alarmed Stacy, but she said she was not scared because he remained jovial, friendly and talkative, and there had been no flirting or sexual advances of any kind by anyone. (RT 603-04.) Stacy left about 4:00 a.m. because she was tired, and although she admitted it now "sounds ridiculous," she did not think there was any risk in leaving Laurel alone with Petitioner. (RT 604-05.)

Stacy went home and slept until about 6:30 a.m., at which point she became alarmed when Laurel did not answer her phone or return her texts. (RT 604-05.) Laurel came home about 7:30 a.m., "really riled up," and told Stacy that Petitioner had raped her and that she was lucky to have gotten away when he fell asleep. (RT 606.) Laurel was out of breath and very agitated, unlike her normal demeanor as a calm, collected person, and Laurel removed money from the pocket of the pants she was wearing and placed it in a drawer. (RT 607-09.) Stacy called the police, who took them to the RV where they identified Petitioner. (RT 607-08.) Stacy said the issue of money came up only after they identified Petitioner, and Stacy then retrieved it from the drawer at their house and gave it to the

police.  (RT 609-10.)  Stacy denied that there was ever any plan to rob Petitioner or hide the money, or that she or Laurel had ever engaged in prostitution.  (RT 610-11.)

San Diego Police Officer Joshua Gustafson testified that he answered a radio dispatch at 8:08 a.m. on March 9, 2011, at the residence of Laurel B. and Stacy Antonel in Ocean Beach.  (RT 627.)  He took a statement from Laurel while another officer took a statement from Stacy, and the two officers then compared the stories and found no discrepancies.  (RT 629.)  Laurel and Stacy were taken to a parking lot where they identified Petitioner and his RV.  (RT 630-31.)  Officer Gustafson then took Laurel for a medical examination, stopping at her house on the way to pick up $1,699 in cash, some of which she had taken off a table as she left the RV, and some she found in the pocket of Petitioner's pants she put on when she could not find her dress.  (RT 631-34.)  Officer Gustafson said Laurel did not mention the money in the initial interview at her house and that it came up about an hour and a half later when she was asked if there was anything in the pockets of Petitioner's pants when she took them.  (RT 640-45.)  She told Officer Gustafson that she took the money because she felt she deserved it after what Petitioner had done to her.  (RT 635.)  Officer Gustafson said Laurel complained that her jaw was sore where Petitioner had punched her, but she declined immediate medical attention.  (RT 636.)

San Diego Police Officer Justin Montoya testified that he and three other officers arrived at Petitioner's RV on the morning of March 9, 2011, in response to a sexual assault complaint.  (RT 653-55.)  Petitioner took his time opening the door of the RV in response to numerous knocks by the officers, and he backed into the RV when commanded to exit.  (RT 655-56.)  Because the victim had reported the presence of a knife and possibly a gun, the officers forced entry into the RV and took Petitioner into custody.  (RT 656.)  Petitioner was identified by the victim and did not appear intoxicated.  (RT 657, 662.)  Without being questioned, Petitioner spontaneously told the officers that he had met two women, one of whom agreed to model for him in a western clothing catalog for $150, and the three of them went to his RV.  (RT 658.)  He said that after one of the women left, another male

came to the RV with alcohol and they all began drinking. (*Id.*) The next thing he remembered was being pushed onto the bed and having his pants taken off. (*Id.*) Petitioner told the officers that he had several thousand dollars lying on a table in the RV, but Officer Montoya did not see any money in the RV. (RT 660-61.)

Patti Rankle, a nurse specializing in sexual assault examinations, testified that she examined Petitioner at 7:10 p.m. on March 9, 2011, and found abrasions on the right side of his head, under his left armpit, on one arm, and in the middle of his back, and a hernia in his left groin. (RT 663-70.) She collected swabs from his fingernails, penis and scrotum, as well as hair from his head and pubic area. (RT 670.) Madeline Marini, a sexual assault nurse, testified that on March 9, 2011, she examined Laurel B., who cried during the examination and complained of soreness in her jaw where she said Petitioner had punched her. (RT 682-88.) Marini observed a possible suction injury on Laurel's left breast, and a one-inch linear abrasion on her right jaw which could have been a scratch. (*Id.*) A pelvic examination revealed a red and tender area near the clitoris with a possible abrasion, and a red and tender hymenal area with an abrasion directly below. (RT 689.) Marini collected swabs from Laurel's mouth, breast and vagina, and said although it was not possible to confirm she was raped, her observations were consistent with Laurel's story. (RT 690-93.)

Mary Beth Sciarretta, a Criminalist with the San Diego Police Department, testified that she processed the sexual assault examination kits. (RT 705.) She did not find any sperm cells or semen, but Laurel B.'s left breast swab contained Petitioner's DNA, and Petitioner's penile swab contained Laurel's DNA. (RT 705-13.) She did not submit the vaginal swabs for DNA testing because she did not observe any sperm cells, and therefore "the probability of obtaining any DNA foreign to the victim automatically decreases." (RT 706-07.) She said only Petitioner's penile and scrotum swabs were tested for DNA, and not his fingernail swabs or hair, because judicious use of her laboratory's resources require that she typically will "choose the most probative evidence." (RT 708-09.)

San Diego Police Detective Jamal Pasha testified that he searched Petitioner's RV with his consent after it had been impounded. (RT 724.) He found a knife in a kitchen

drawer, a clear plastic cup and a liquor bottle in the sink, and Laurel's panties in the bed. (RT 726-30.) There was no money, but Laurel's dress and bra were recovered. (RT 743-44.) Detective Pasha said Laurel called him on March 10, 2011, and said she remembered accepting $13 from Petitioner to buy cigarettes, but did not spend it that night because he bought the cigarettes, that she had since spent $10 of it before she realized it was his, and returned the remaining $3. (RT 731-32.) Laurel told Detective Pasha she laughed as she ran from the RV because she did not think she was going to get away. (RT 746-48.)

Lawrence Morris testified that he was currently in custody, that he had been convicted of felony theft in 2008, and that he had convictions for possession of stolen property and a history of drug use. (RT 790-91.) He said he had not been promised anything from the prosecutor for his testimony, but hoped for assistance in getting into a drug rehabilitation program. (*Id.*) He testified that he was in custody with Petitioner in the summer of 2012, and when Petitioner became aware Morris was about to be released, he gave Morris verbal and written instructions to offer a reward to any woman who would testify she had gone out with Petitioner and had enjoyed her stay in his RV where they had nonviolent sex. (RT 791-95.) Petitioner told Morris he would pay $10,000 to anyone willing to testify, pursuant to a written script provided by Petitioner, that they were at the Ocean Beach parking lot on the night of the incident and saw a woman leave his RV with no sign of violence, who was immediately asked by a woman waiting outside the RV if "she got the money," that the woman who came from the RV replied no, went back inside, and replied yes when she came back out and was asked the same thing by the woman waiting outside, who then said "let's get the hell out of here." (RT 792-800.) Petitioner said he would pay Morris $5,000 for that service when the charges against him were dropped. (RT 797.)

An investigator with the San Diego County District Attorney's Office testified that he obtained handwriting exemplars from Petitioner and Morris. (RT 815-18.) A Forensic Document Examiner with the San Diego Police Department Crime Lab testified that he

conducted a handwriting comparison analyses and opined there was a high probability Petitioner wrote the letters turned in by Morris. (RT 753-54.)

At the first trial, the prosecutor introduced only documentary evidence of Petitioner's prior Oklahoma conviction, but the victim of that crime testified at the retrial over a defense objection. (RT 253-74.) Cheryl B. testified that in the summer of 1984 she was 20 years old, a newlywed married for eight months, and was working the graveyard shift at a convenience store in Oklahoma. (RT 824-25.) Petitioner came to the store one evening as she began her shift, while her co-worker was still there, and wanted to purchase beer, but state law prevented the sale of beer at that time. (RT 825-26.) Petitioner returned several hours later when she was working alone, asked if he could park his motorcycle in the parking lot overnight, and asked her to come outside and show him where to park. (RT 826-27.) She went outside with him and pointed to a place by her own car where she would be able to keep an eye on his motorcycle, at which point he came up behind her and held an eight-inch buck knife to her throat. (RT 827.) He told her if she did not get on his motorcycle and leave with him he would kill her. (*Id.*) She told him that although she was not allowed to sell him beer she would give him some, along with cash from the register, gasoline and food, but he told her the only thing he wanted was her and repeated his threat to kill her if she did not go with him. (*Id.*)

They left on his motorcycle, and as they drove through town he pulled up to a stop sign in front of the police station, where he told her if she tried to jump off or scream he would kill her. (RT 828.) They drove for about 30 to 45 minutes down a small country road where he stopped and forced her to have oral sex. (RT 828-29.) He placed his penis in her mouth and told her: "If I didn't swallow everything that he was going to kill me," and ejaculated. (RT 829.) She burned her arm on a motorcycle pipe and began crying, and he told her if she did not stop crying he would kill her. (*Id.*) He put both of his arms around her throat and choked her until she lost consciousness and fell down. (*Id.*) He was standing over her when she regained consciousness, and told her to get on the motorcycle or he would kill her. (RT 829-30.) He drove them for a distance and stopped in a vacant lot in

a small country town where he told her to take off all her clothes and lie down. (RT 830.) He then raped her against her will, placing his penis in her vagina. (*Id.*) They got dressed and Petitioner drove them to the next town, about 40 miles from where she was abducted, where they were stopped by the police because an all-points bulletin had been issued for them. (RT 831-32.) She said her husband had noticed her missing from the store with her car still there and the cash register unlocked, and had obtained Petitioner's description from her co-worker. (*Id.*) Cheryl said she went to court to face Petitioner, which she was not required to do, and after attending a hearing without a jury, she was called into the judge's chambers and was told he had pleaded guilty. (RT 833.) She then sat in court while Petitioner entered his guilty plea. (*Id.*)

The parties stipulated that on August 8, 1984, Petitioner pled guilty to kidnapping Cheryl B. with the intent to rape her and to first degree rape. (RT 835.) The People rested. (RT 836.) The defense rested without presenting evidence, although Petitioner had testified at his first trial. (RT 848.)

After deliberating for one and one-half days, during which the jury requested clarification on the use of a deadly weapon allegation and had the testimony of the prosecution DNA expert Mary Beth Sciarretta read back, they found Petitioner guilty of one count of forcible rape and two counts of forcible oral copulation, but returned a not true finding on the allegation that he personally used a knife during those offenses. (RT 993-94; CT 341-44.) The jury was unable to reach a verdict as to count four, rape by a foreign object, and count five, false imprisonment by violence, menace, fraud or deceit, and a mistrial was declared on those counts. (RT 995-96.) After the jury informed the court they had reached a verdict, but before the verdicts were accepted, the prosecutor was allowed to amend the information to charge two strikes arising from the Oklahoma conviction rather than one, over a defense objection that the amendment was untimely and violated double jeopardy having come after the previous mistrial. (RT 981-85.)

In a bifurcated bench trial on the prior conviction allegations, Lori Adams, a San Diego Police Detective with the sex crimes unit, testified that she interviewed Petitioner

and he told her that the 1984 Oklahoma conviction involved a misunderstanding between him and the victim. (RT 1004-05.) Petitioner told her he was passing through town and met the victim, who told him she wanted to leave town and leave her husband, and asked for a ride on his motorcycle. (RT 1005-06.) They took a short ride, and when he returned her to the store she saw her husband and asked Petitioner to drive her away. (RT 1006.) Petitioner told Detective Adams that he had served 25 years in prison as a result of the conviction arising from those events. (*Id.*) The prosecutor offered into evidence certified documents of the Oklahoma conviction, and asked the court to take judicial notice of Cheryl B.'s trial testimony. (RT 1006-09.) Defense counsel objected to the use of the Oklahoma conviction documents on the basis they were not properly authenticated and to the use of Cheryl B.'s trial testimony on the basis she was not available for cross-examination at the bifurcated bench trial. (RT 1006-12.) Both objections were overruled. (*Id.*)

Petitioner then testified at the bench trial on his priors that the sheriff who arrested him in Oklahoma used coercion and torture to obtain his guilty plea, including shooting him during his arrest without need. (RT 1014-17.) He said that while he was in jail the sheriff and his deputies pistol whipped him, hit him in the groin with a cattle prod, choked him to unconsciousness, threw water on him in the middle of the night, and threatened to kill him. (*Id.*) He said Cheryl B. wanted to go with him to get away from her abusive husband and that she had concocted the rape and kidnapping story in order to avoid being beaten by her husband when he saw them together. (RT 1017.) He said that his appointed lawyer was an "informant" who falsely told him he would get 12 years if he pled guilty to kidnapping for extortion, but he ended up serving 25 years. (RT 1018-19.) He said he never pled guilty to rape, and that the rape charge was later surreptitiously added to the conviction documents which he only discovered after he had served 21 years. (RT 1021-22.) The trial judge found the prior Oklahoma conviction allegation true, found that it qualified Petitioner as a habitual sexual offender, and found that it qualified as a prison

prior, a serious felony prior, and two strike priors; he was sentenced to 225 years-to-life plus 18 years, later reduced to 150 years-to-life plus 18 years. (RT 1024-27, 1061-62.)

### III.   DISCUSSION

Petitioner claims that his federal constitutional rights were violated (1) by the testimony of the victim of his prior Oklahoma conviction because it was inadmissible under the state evidence code and violated the federal due process prohibition against the use of propensity evidence (claim one); (2) by the withholding of exculpatory and impeachment evidence by the prosecution in failing to perform DNA testing of the vaginal swabs collected from Laurel and the fingernail swabs and hairs collected from him (claim two); (3) because there is insufficient evidence to support the forcible rape and forcible oral copulation convictions since the jury found the knife use allegation to be not true, the sex acts occurred after the violent acts, and because Laurel's trial testimony was not credible in that it diverged in minor ways from her testimony at the first trial, the preliminary hearing, and her statements to the police and the examining nurse (claim three); (4) by ineffective assistance of counsel because trial counsel (a) refused to obtain Petitioner's cell phone records, which would have shown that Laurel programmed her number into Petitioner's phone, which could have been used to challenge the prosecution's closing argument that because Petitioner did not know how to find Stacy and Laurel they had no motive to falsely accuse him, (b) failed to obtain surveillance video from the Ocean Beach gas station or businesses around the parking lot, or interview employees of those businesses, in order to challenge the veracity of Laurel's timeline testimony, (c) failed to raise a vindictive prosecution defense on the basis that the prosecutor believed Laurel had been raped rather than believe Petitioner had been robbed simply because he had a prior rape conviction, (d) sought to call as character witnesses women Petitioner had dated or had sex with, who could not be found without his cell phone records, and refused to find and call as character witnesses women Petitioner had helped and had not taken advantage of when they were vulnerable, (e) failed to challenge the prosecution's failure to test all of the biological evidence, and (f) failed to file a motion to dismiss based on the jury's not

true finding on the knife use allegation (claim four); and (5) by ineffective assistance of appellate counsel for failing to raise the claims presented in the Petition, and failing to challenge the late amendment of the information (claim five).  (Pet. at 6-10, 29-76.)

Respondent answers that (1) the state court adjudication of those claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law; (2) even assuming federal errors occurred, they are harmless because Petitioner received a fair trial; (3) the state court factual findings are entitled to deference; and (4) Petitioner is not entitled to an evidentiary hearing.  (Ans. Mem. at 3, 11-25.)  Petitioner replies that the state court adjudication of the those claims is contrary to federal law, that the errors are not harmless, that the state court factual findings are not entitled to deference, and that he is entitled to an evidentiary hearing.  (Traverse at 1-10.)

Petitioner raises additional claims in his Proposed Amendment to the Petition, claiming that the use of the documentary evidence of his prior Oklahoma conviction to enhance his sentence violated his federal rights to due process, to confront witnesses, and to be free from being twice placed in jeopardy, because: (a) the documents introduced at the bench trial were incomplete, improperly authenticated, and contained false statements; (b) many of the documents introduced at his second trial was not presented at his first trial; (c) he was not permitted to confront the person who certified the documents; and (d) the evidence is insufficient to qualify him for an enhanced sentence under the Three Strikes law.  (ECF No. 43 at 31-63.)

Respondent answers that habeas relief is unavailable as to these claims because the confrontation claim is procedurally defaulted and without merit, the state court adjudication of the remaining claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and any alleged errors are harmless.  (Suppl. Ans. Mem. at 10-26.)  Petitioner replies that his confrontation claim is not defaulted, that his claims all merit habeas relief, that any errors are not harmless, that he has rebutted the presumption of correctness of the state court factual findings, and that he is entitled to an evidentiary hearing.  (Suppl. Traverse at 2-30.)

15-CV-2576-AJB(WVG)

## A.    Standard of Review

In order to obtain federal habeas relief with respect to a claim that was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).   Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).   Furthermore, a petitioner must also show that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors." *Gautt v. Lewis*, 489 F.3d 993, 1015 (9th Cir. 2007), citing *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991) (recognizing "most constitutional errors can be harmless.")

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).   A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407.   Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011).   In order to satisfy § 2254(d)(2), the petitioner must show that the

15-CV-2576-AJB(WVG)

factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

**B.      Claim One**

Petitioner alleges in claim one that the introduction of the testimony by the victim of his prior Oklahoma conviction at the guilt phase of his trial violated his federal due process rights, because the jury was instructed it could consider the evidence to show he had a propensity to commit similar sexual offenses and in deciding whether he acted with the required intent rather than under a mistaken belief in consent. (Pet. at 6, 29-41.) He first argues that the evidence was improperly admitted under the California Evidence Code because (1) it was not probative to show his intent or the victim's consent, as there was no middle ground on the issue of consent because either the victim consented or Petitioner held a knife to her throat; (2) even if it was probative it was cumulative to Laurel B.'s testimony; and (3) any probative value was outweighed by prejudice, as his prior conviction is dissimilar to and more inflammatory than the charged offenses, is remote in time, and confused the jury in that they were unaware he had served 25 years in prison for it and may have wanted to punish him for that offense. (Pet. at 30-38.) He next argues that the admission of that evidence violated federal due process because the United States Supreme Court, in reserving ruling on whether the introduction of propensity evidence in a state trial violates federal due process in *Estelle v. McGuire*, 502 U.S. 62, 70-73 (1991), recognized that the admission of propensity evidence can rise to the level of a federal due process violation, and he argues that this is one of those instances. (*Id.* at 30-38; Traverse at 6.) He claims that the admission of the evidence was prejudicial because this was a close case, turning on the credibility of the victim, as shown by the fact that (1) the first jury could not reach a verdict on any count, and on retrial the jury could not reach a verdict on two of the five counts and found the weapon use allegation untrue; and (2) the first jury only heard bare facts about the Oklahoma conviction, whereas the second jury heard victim testimony, suggesting that the additional, inflammatory details tipped the scales from a mistrial to a conviction. (Pet. at 38-41.)

Respondent answers that there is no clearly established United States Supreme Court precedent which has held that the admission of propensity evidence is unconstitutional, and the denial of the claim by the state court therefore could not be contrary to, or involve an unreasonable application of, clearly established federal law. (Ans. Mem. at 12-15.) Respondent also argues that the state court correctly found the evidence was admissible under state law, and therefore its decision does not involve an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. (*Id.*) Petitioner replies that the testimony of the victim of his prior conviction resulted in a fundamentally unfair trial. (Traverse at 5-6.)

Petitioner presented this claim to the state supreme court in his first petition for review. (Lodgment No. 7 at 7-14 [ECF No. 29-13 at 11-18].) That petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 8.) The same claim was presented to the state appellate court on direct appeal (Lodgment No. 3 at 6-13 [ECF No. 29-9 at 12-19]), and denied in a written opinion. (Lodgment No. 6.)

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991). Therefore, with respect to claim one, the Court will look through the silent denial of this claim by the state supreme court on direct appeal to the last reasoned state court opinion addressing the claim, the appellate court opinion on direct appeal, which stated:

> Evidence of other crimes committed by the defendant is generally inadmissible to prove the defendant has a propensity to commit crimes. (*People v. Catlin* (2001) 26 Cal.4th 81, 145.) However, Evidence Code section 1108 (section 1108) sets forth an exception to the general rule against the use of propensity evidence. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.) When a defendant is charged with a sex offense, section 1108 allows admission of evidence of other sex offenses to prove the defendant's disposition to commit sex offenses, subject to the trial court's discretion to exclude the evidence under Evidence Code section 352 (section 352). (§ 1108, subd. (a); *Falsetta,* at p. 911; *People v. Lewis* (2009) 46 Cal.4th 1255, 1286.) In *Falsetta,* the California Supreme Court ruled that section 1108 was constitutional. (*Falsetta,* at pp. 910–922.) The *Falsetta* court reasoned that

sex offense propensity evidence was critical in sex offense cases given the serious and secretive nature of sex crimes. (*Id.* at p. 918.) Further, a defendant's constitutional right to a fair trial is properly safeguarded by requiring the trial court to engage in a careful weighing process under section 352 to determine whether probative value is substantially outweighed by the danger of undue prejudice, confusion, or time consumption. (*Falsetta,* at pp. 916–917). Based on section 1108, "the presumption (is) in favor of admissibility" of uncharged sex offense evidence. (*People v. Loy* (2011) 52 Cal.4th 46, 62.)

Evidence of the defendant's other crimes is also admissible under section 1101, subdivision (b) (section 1101(b)) for the limited purpose of proving such matters as intent or lack of mistake. (*People v. Catlin, supra,* 26 Cal.4th at p. 145.) Admission under section 1101(b) is also subject to the trial court's discretion to exclude the evidence under section 352 if the potential for prejudice outweighs the probative value. (*People v. Balcom* (1994) 7 Cal.4th 414, 426.)

The decision whether to apply section 352 to exclude otherwise admissible evidence "'is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.'" (*People v. Falsetta, supra,* 21 Cal.4th at pp. 917–918.) On appeal we will not disturb the trial court's ruling unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Lewis, supra,* 46 Cal.4th at p. 1286.)

Defendant argues the evidence of his Oklahoma sex offense should have been excluded because (1) section 1108 violates his right to due process under the federal Constitution, and (2) the court abused its discretion under section 352. The constitutional challenge is unavailing. As defendant recognizes, the California Supreme Court has found section 1108 to be constitutional. (*People v. Falsetta, supra,* 21 Cal.4th 903.) We are bound to follow our high court's ruling. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see *People v. Loy, supra,* 52 Cal.4th at pp. 60–61 (declining to reconsider *Falsetta*).)

To support his claim the court abused its discretion in admitting the evidence, defendant argues the prior and current incidents were dissimilar, the prior offense was remote and more inflammatory, and there was a risk the jury would convict to punish him for the prior offense.

Although the similarity between the prior and current sex offenses is a relevant factor to consider when conducting the weighing process under section 352 (*People v. Lewis, supra,* 46 Cal.4th at p. 1285), there is no strict similarity requirement for admission of the evidence. (See *People v. Loy, supra,* 52 Cal.4th at p. 63; *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.) Here, in both the Oklahoma and current offenses, defendant lured a woman late at night to a location where she was more vulnerable, used force and threats to compel her to comply with his sexual demands, and engaged in oral copulation and sexual intercourse with her. Although there were some factual differences between the two offenses (for example, the current offense, unlike the prior offense, involved drinking and socializing prior to the assaultive behavior), they were not so dissimilar as to significantly diminish the high probative value of the prior offense. Nor was the prior offense unduly inflammatory as compared to the current offense; both offenses involved threats of serious injury or death that caused the victims to comply with defendant's sexual demands, and sexual activity of a comparable invasiveness. Remoteness was of minimal significance; although the 1984 Oklahoma offense occurred many years prior to the current offense, the record shows defendant was in prison until September 2009 and he committed the current offense in March 2011, which was *less than two years* after his release from prison. (See *People v. Loy, supra,* 52 Cal.4th at p. 62.)

Defendant argues the jurors may have improperly wanted to punish him for the prior offense because they may have inferred he did not serve a lengthy prison term given his talk about his successful business during the charged incident. Defendant has not shown an abuse of discretion based on this claim. The jurors knew from L.B.'s testimony that defendant had been in prison, and the jurors could have just as easily inferred that defendant's talk about his business was a fabricated story to keep L.B. interested rather than an indication that he had not spent much time in prison. [Footnote: L.B. testified defendant disclosed he had been in prison before.] Further, the court explicitly instructed the jurors that uncharged offense evidence was not sufficient by itself to prove the charged crimes, and the prosecution had to prove each charge beyond a reasonable doubt. (See CALCRIM Nos. 1191, 375.) The fact that the jurors acquitted defendant of the personal weapon use allegation reflected they were aware of their duty to carefully evaluate the evidence and they knew they could not convict merely because he had engaged in criminal conduct in the past. (See *People v. Robertson, supra,* 208 Cal.App.4th at p. 994.)

Finally, defendant contends the court should not have admitted the evidence under section 1101(b) on the issues of intent or belief in consent

because the evidence was cumulative on these issues. In support, he cites *People v. Balcom, supra,* 7 Cal.4th 414, where the court held prior offense evidence was merely cumulative (and hence more prejudicial than probative) because the victim's testimony, if believed, that the defendant held a gun to her head provided compelling evidence of the defendant's intent during sexual intercourse. (*Id*. at pp. 422–423.) Defendant posits that, likewise here, the victim's testimony, if believed, provided compelling evidence of his intent and absence of belief in consent so as to substantially diminish the probative value of the prior sex offense evidence. We are not persuaded.

Unlike the circumstances in *Balcom,* L.B.'s testimony did not so definitively establish defendant's state of mind as to require the court to disallow consideration of the prior offense evidence on the issues of intent and belief in consent. Although L.B. described numerous facts supporting that defendant engaged in forcible sexual conduct, she also described several factors relevant to a contrary conclusion concerning defendant's state of mind, including her voluntary decision to go with defendant to his RV, her initial allowance of his kissing her, her statement to defendant that she would stay when he told her she could leave, and her decision to take defendant's money. The court was not required to find the nature of the victim's testimony was so clear cut that, if credited, it rendered the prior offense evidence merely cumulative as to defendant's state of mind.

(Lodgment No. 6, *People v. Williams*, No. D063742, slip op. at 7-12 [ECF No. 29-12 at 7-12].)

Petitioner first contends that the evidence of his prior Oklahoma conviction was erroneously admitted under California Evidence Code § 1108. He argues it was not relevant to Laurel's consent or to his intent and was cumulative to Laurel's testimony. Also it was erroneously admitted under California Evidence Code § 352 because its probative value was outweighed by its prejudice as it is dissimilar to and more inflammatory than the charged offenses, is remote in time, and had the potential to confuse the jury since they were not told that he had served 25 years in prison as a result of the conviction and they may have wanted to punish him for that offense. (Pet. at 33-38.) As quoted above, the appellate court rejected this argument as a matter of state law. The United States Supreme Court has held that an inquiry into whether evidence was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas review of a state conviction."

24

*McGuire*, 502 U.S. at 67. The state court rejection of this aspect of claim one is therefore neither contrary to, nor involves an unreasonable application of, clearly established federal law. *Richter*, 562 U.S. at 102; *Lockyer*, 538 U.S. at 75-76; *Williams*, 529 U.S. at 405-07; *McGuire*, 502 U.S. at 67.

Petitioner next contends that "[t]he admission of propensity evidence, in contravention of longstanding traditions of Anglo-American jurisprudence, deprived [him] of due process." (Pet. at 31-33, citing *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (noting that prejudice results from introduction of evidence used to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," because it risks the jury convicting a defendant because he is "a bad person, or one portrayed as bad, [who] deserves punishment."))  As Petitioner correctly observes (*id.* at 32) however, the Supreme Court in *Old Chief* was relying on its supervisory role regarding *federal* trials, but in *McGuire* it left open the issue as to "whether a *state law* would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." *McGuire*, 502 U.S. at 75 n.5 (emphasis added).

The Ninth Circuit has read *McGuire* as providing that there are circumstances under which a federal habeas petitioner can establish a federal due process violation by showing that the admission of evidence was so prejudicial that it rendered the trial fundamentally unfair. *See Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.") (citing *McGuire*, 502 U.S. at 67-69; *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."))  Petitioner argues that this is one of those situations envisioned by the Supreme Court in *McGuire* where the introduction of evidence of his prior sex offense to show he has a propensity to commit such crimes resulted in a fundamentally unfair trial and a violation of due process.

However, in *Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006), the Ninth Circuit held that because the Supreme Court in *McGuire* specifically reserved ruling on the issue regarding whether introduction of propensity evidence can give rise to a federal due process violation, and has denied certiorari at least four times on that issue since *McGuire* was decided, the right "has not been clearly established by the Supreme Court, as required by AEDPA." *Id.* at 866-67; *see Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (holding that the state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (granting habeas relief under AEDPA based on state court's limitation on cross-examination and refusal to admit impeachment evidence, but observing that even though the petitioner received a fundamentally unfair trial as a result of the introduction of prejudicially irrelevant evidence, a federal habeas court applying AEDPA could not grant the writ on that basis because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.")

Accordingly, with respect to the aspect of claim one alleging that the introduction of Cheryl B.'s testimony regarding his prior sex offense amounted to a violation of federal due process because it unfairly permitted the jury to infer that he had a propensity to commit crimes similar to the ones with which he was charged, or was so prejudicial as to render his trial fundamentally unfair, the state court adjudication is neither contrary to, nor involved an unreasonable application of, clearly established federal law. *Richter*, 562 U.S. at 102; *Wright*, 552 U.S at 125-26; *Lockyer*, 538 U.S. at 75-76; *Williams*, 529 U.S. at 405-07; *Holley*, 568 F.3d at 1101; *Alberni*, 458 F.3d at 867.

In addition, there is no basis to find that the state court adjudication of claim one is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner challenges Cheryl B.'s trial testimony, contending that her version of the events is inconsistent with his own version of the events as set forth in his declaration. (*See* Decl. of Pet. attached to Traverse at 20-24 [ECF No. 39-1 at 20-

15-CV-2576-AJB(WVG)

24].) However, in order to satisfy this provision, Petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. *Miller-El*, 537 U.S. at 340. In order to do so, he must show "there was an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*." 28 U.S.C. § 2254(d)(2) (emphasis added). His reliance on his own post-conviction declaration to challenge the trial testimony of the victim of his Oklahoma conviction is insufficient to attack the factual basis on which the state court relied to reject this claim. *Id.* In any case, a federal habeas petition is not a proper vehicle for challenging the credibility of a state trial witness. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (federal habeas courts must respect the "factfinder's province to determine witness credibility."); *see also Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.")

Accordingly, the Court finds that habeas relief is not available as to claim one because the state court adjudication of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Before addressing the remaining claims in the Petition, the Court will address the claims raised in the Proposed Amendment, which, as with claim one, challenges evidence of his prior conviction.

## C. Proposed Amendment

In his Proposed Amendment, Petitioner claims that (1) the documentary evidence introduced at the bench trial to establish the truth of the prior Oklahoma conviction is incomplete, improperly authenticated, and contains false statements in the narrative of the crimes; (2) the trial court erred in allowing a late amendment of the information to allege that his Oklahoma conviction constituted two strikes rather than one; (3) he was denied his right to confront the person who certified the accuracy of the Oklahoma conviction documents within the meaning of *Crawford v. Washington*, 541 U.S. 36 (2004); and (4) the evidence was insufficient to enhance his sentence under the Three Strikes law. (ECF No. 43 at 31-63.)

Respondent answers that (1) the confrontation claim is procedurally defaulted because it is now too late for him to return to the state court with that previously unexhausted claim, but—in any event—the claim can be denied because it is entirely without merit; (2) the state court adjudication of the remaining claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law; and (3) any errors are harmless because Petitioner received a fair trial. (Suppl. Answer at 2; Suppl. Ans. Mem. at 10-26.)

Petitioner replies that the evidence is insufficient to support the finding that he had suffered the prior conviction, and that he has rebutted the presumption of correctness of the state court factual findings as to that claim because "the factual record dictates a contrary conclusion as a matter of law." (Suppl. Traverse at 2-27.) He contends his confrontation clause claim is not defaulted because he properly presented it to the state appellate court which then impermissibly evaded review of the claim, and that his double jeopardy claim has merit because he has been punished twice for the same prior conviction. (*Id.* at 27-30.)

These claims were raised in the *pro se* petition for review Petitioner filed in the state supreme court following the appeal of his resentencing, which was summarily denied. (Lodgment Nos. 11, 17.) He presented the same claims in a pro se supplemental brief filed in the appellate court on appeal of his resentencing. (Lodgment No. 16.) The appellate court denied relief, stating:

> As noted, defendant also raised a series of contentions in his supplemental brief, including that: (1) the trial court erred in admitting evidence of his 1984 Oklahoma conviction because the evidence as insufficient and/or inadmissible to support that conviction and because in any event, the admission of such evidence violated his constitutional rights; and (2) the trial court abused its discretion in imposing consecutive as opposed to concurrent sentences on each of the three counts.

> As to defendant's first contention, these issues were fully litigated in defendant's first appeal and were the subject of extensive discussion in our previous opinion in this case. As such, those issues are not now properly

before us in this, defendant's second appeal, which as noted merely involved his resentencing.

(Lodgment No. 10, *People v. Williams*, No. D067567, slip op. at 9 (Cal. Ct. App. Oct. 5, 2015).)

Because the second appellate court opinion rested its decision on the first appellate court opinion, the Court will look through the silent denial by the state supreme court to the first state appellate court opinion. *See Ylst*, 501 U.S. at 804 n.3 ("Since a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default, its effect upon the availability of federal habeas is nil . . . ."); *see also Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005) ("Before we can apply [the] standards [of § 2254(d)], we must identify the state court decision that is appropriate for our review. When more than one state court has adjudicated a claim, we analyze the last reasoned decision.") To the extent the first state appellate court did not address the claims, the Court will treat the silent denial of the state supreme court as a denial on the merits. *See Johnson v. Williams*, 568 U.S. 289 ___, 133 S. Ct. 1088, 1096 (2012) (when a state court issues a reasoned decision but appears to ignore a federal claim, there is a rebuttable presumption the claim was denied on the merits).

Petitioner first claims that the introduction of evidence of his prior Oklahoma conviction to enhance his sentence violated his federal due process rights because the documentary evidence introduced at the bench trial to establish the truth of that conviction is incomplete, improperly authenticated, and contains false statements in the narrative of the crime. (ECF No. 43 at 31-37.) He challenged the authentication of those documents and the use of the crime narrative at trial. (RT 976-78.) The trial judge found: "It looks to me as though these documents substantially comply with business records and official records. And on that basis the *Crawford* Sixth Amendment objection is overruled." (RT 978.) His appointed appellate attorney on direct appeal challenged the use of the prior conviction as unfairly prejudicial and as providing insufficient evidence of an asportation element necessary for it to be used to support a strike for kidnapping, but did not challenge

the authenticity of the documentation. (Lodgment No. 3.) As set forth above in the discussion of claim one, the appellate court found that evidence of the prior Oklahoma rape conviction was properly admitted at trial. (Lodgment No. 6, *People v. Williams*, No. D063742, slip op. at 7-12.) The appellate court then stated:

> Defendant does not dispute that his Oklahoma *rape* conviction qualifies as a prior serious felony, but he contends it cannot be used for this enhancement because it was not properly pled in the information. For the habitual sex offender, prior serious felony, and prior prison term allegations, the information identified the Oklahoma case by the term "Kidnapping." For the two prior strike allegations, the information initially pled one strike prior allegation, denominated "Kidnapping," and at trial the prosecution added the second strike prior allegation, denominated "Rape." Under the circumstances of this case, we find no pleading barrier to the use of the Oklahoma rape conviction to support the prior serious felony enhancement.

> As a matter of due process, a defendant has a right "to fair notice of the specific enhancement allegations that will be invoked to increase punishment for his crimes." (*People v. Mancebo* (2002) 27 Cal.4th 735, 747.) Here, the serious felony prior conviction alleged in the information described the "Charge" as "Kidnapping," and provided the date of the conviction, the court case number, and the county and state where the conviction was incurred. From this allegation, defendant knew the prosecution was seeking to impose the five-year serious felony enhancement based on his Oklahoma case. Also, prior to trial the defense was provided with copies of the Oklahoma court documents, which reflect that the Oklahoma case involved two convictions, i.e., the kidnapping count and the rape count. Although the information in the current California case referred to the Oklahoma conviction merely as "Kidnapping," the Oklahoma court documents apprised defendant of the specific nature of the charges, including kidnapping for extortion (defined as seizing, kidnapping, and confining with intent to commit rape) and first degree rape.

> On appeal, defendant does not claim that he was not on notice that his Oklahoma case included a rape conviction, and the record supports that he knew in a timely fashion that the rape conviction was a component of the Oklahoma case. For example, during trial (for purposes of the prior sex offense evidence) the parties stipulated to the two convictions underlying the Oklahoma case. Thereafter, while the jury was in deliberations, the prosecutor successfully moved to amend the information to allege rape as a second strike arising from the Oklahoma case. Although defense counsel objected to the

amendment as untimely, he did *not* argue that defendant was prejudicially deprived of notice of the rape conviction even though the court invited him to address the point. Later, at sentencing, the trial court stated the "Oklahoma prior, particularly the rape" qualified defendant as a habitual sex offender. Defense counsel did not object to the trial court's reliance on the rape conviction even though the habitual sex offender allegation in the information, like the prior serious felony allegation, referred only to the Oklahoma case as "Kidnapping." Finally, defense counsel did not object when the trial court stated at sentencing that it was imposing sentences for both the serious felony and prison term enhancements because there were two Oklahoma convictions. It is clear from the record that the manner in which the case was pleaded did not mislead defendant to think his Oklahoma case involved only a kidnapping conviction.

Further, the circumstances here are not comparable to those in *Mancebo*, where the Supreme Court found a due process violation in circumstances where the prosecutor alleged a special circumstance based on gun use, and at sentencing the trial court imposed sentence based on an uncharged special circumstance of multiple victims. (*People v. Mancebo, supra*, 27 Cal.4th at pp. 738-739, 753.) In *Mancebo* the alleged fact of gun use could not be characterized as expressly or impliedly incorporating the fact of multiple victims. In contrast here, defendant knew from the information that the prosecution was seeking to impose a serious felony enhancement based on the Oklahoma case, and he knew that the Oklahoma case *incorporated both the rape and kidnapping convictions*. Because there is no showing of a due process/notice concern here, it is reasonable to construe the information's characterization of the Oklahoma charge as "Kidnapping" as a shorthand reference to the kidnapping for extortion with intent to rape convictions, as well as the rape conviction.

(Lodgment No. 6, *People v. Williams*, No. D06374, slip op. at 19-21.)

"As a matter of due process, an offender may not be sentenced on the basis of mistaken facts or unfounded assumptions." *Roberts v. United States*, 445 U.S. 552, 563 (1980). Petitioner stipulated at trial that he had been convicted in Oklahoma of kidnapping for rape and first degree rape. (RT 835.) The victim of those crimes testified at Petitioner's trial, subject to cross-examination, to the facts of those offenses, and testified that she was in the courtroom when he entered a guilty plea. (RT 833.) A detective with the sex crimes unit testified that Petitioner told her that he served 25 years in prison as a result of the

conviction arising from those events. (RT 1006.) Even assuming the truth of Petitioner's allegation that the Oklahoma conviction documents were incomplete or improperly authenticated, his failure to allege he was sentenced based on false facts regarding the prior conviction, as opposed to merely identifying incidental errors in the authentication of the documentation of his prior conviction, does not even allege a federal due process violation. *Roberts*, 445 U.S. at 563. Although it is unclear whether the state appellate court was correct to deny this claim on the basis that it had been adjudicated in the prior appellate court opinion, even to the extent the state appellate court ignored the claim, for the same reasons just discussed, Petitioner is unable to show the state court denial is contrary to, or an unreasonable application of, clearly established federal law. *Id.*; *see also Johnson*, 133 S. Ct. at 1096 (holding that when a state court issues a reasoned decision but appears to ignore a federal claim, there is a rebuttable presumption the claim was denied on the merits); *Richter*, 562 U.S. at 102 (holding that when faced with such a presumption, a federal habeas court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court).

Furthermore, even if Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d) with respect to this claim, and assuming a federal constitutional violation occurred as a result of the reliance by the trial judge on improperly authenticated documents, any such error is subject to harmless error analysis. *See United States v. Weiland*, 420 F.3d 1062, 1078 (9th Cir. 2005) (applying harmless error to erroneous admission of prior conviction documents); *Gautt*, 489 F.3d at 1015 (noting that harmless error review applies unless the constitutional error is of the type included on the Supreme Court's "short, purposely limited roster of structural errors.") (citing *Fulminante*, 499 U.S. at 306 (recognizing that "most constitutional errors can be harmless.")). Habeas relief is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or unless the judge 'is in grave doubt' about the harmlessness of the error." *Medina v.*

*Hornung*, 386 F.3d 872, 877 (9th Cir. 2004) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Assuming the truth of the allegation that the Oklahoma conviction documents were not properly authenticated, were technically deficient, or contained false statements in the narrative of the crimes, the Court is not in grave doubt whether the outcome of the sentencing proceeding was affected in any way. Petitioner stipulated at trial that he had been convicted of kidnapping for rape and first degree rape, the victim of those crimes testified at his trial to the facts of those offenses and testified that she was in the courtroom when he entered a guilty plea, and a sex unit detective testified that Petitioner admitted he had served 25 years in prison as a result of that conviction. Although Petitioner contends that the victim of his Oklahoma conviction did not witness his plea (Suppl. Traverse at 12), as set forth above, her testimony was presented to the trier of fact, and federal habeas is not a proper avenue to challenge her credibility. Because there is no factual dispute that Petitioner was convicted of rape in Oklahoma, it is clear that any error arising from a failure to properly authenticate the conviction documents is harmless. Thus, the Court is not "in grave doubt" whether a federal constitutional error arising from the use of improperly authenticated Oklahoma conviction documents resulted in a "substantial and injurious effect or influence" on the trial judge's finding that the prior conviction allegation was true. *Brecht*, 507 U.S. at 637; *O'Neal*, 513 U.S. at 436.

Petitioner next contends that the introduction at his second trial of evidence of the Oklahoma conviction which had not been presented at his first trial, including the testimony of the Oklahoma victim and the certified copies of the prior conviction documents (a fax copy of those documents were used at the first trial), violates federal double jeopardy principles and supports a finding of vindictive prosecution. (ECF No. 43 at 34-49.) Respondent answers that double jeopardy principles are not implicated in a retrial of a prior conviction allegation, but does not address the vindictive prosecution aspect of the claim. (Suppl. Ans. Mem. at 13.)

Although Petitioner presented these claims to the state appellate and supreme courts, neither court expressly addressed the claims when denying the petitions in which they were raised. Accordingly, this Court must presume the silent denial by the state supreme court was a decision on the merits of the ineffective assistance of appellate counsel claim. *Richter*, 562 U.S. at 102; *Johnson*, 133 S. Ct. at 1096. The Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Richter*, 562 U.S. at 102.

"The Double Jeopardy Clause 'protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (quoting *N.C. v. Pearce*, 395 U.S. 711, 717 (1969) (footnotes omitted), *overruled on other grounds by Ala. v. Smith*, 490 U.S. 794, 802 (1989)). Petitioner was neither acquitted nor convicted at his first trial, as the jury was unable to reach a verdict at the guilt phase and no trial on the prior conviction enhancement was held. The state supreme court could have reasonably denied this claim on the basis that his second trial did not violate double jeopardy. *Or. v. Kennedy*, 456 U.S. 667, 672 (1982) (finding that it has been long-settled that double jeopardy does not preclude retrial after a jury was unable to reach a verdict in the first trial); *Monge v. Cal.*, 524 U.S. 721, 728 (1998) ("Historically, we have found double jeopardy protections inapplicable to sentencing proceedings because the determinations at issue do not place a defendant in jeopardy for an offense.") (citation and internal quote marks omitted).

With respect to the vindictive prosecution claim, federal due process forbids "'enhanced sentences or charges . . . motivated by actual vindictiveness toward the defendant for having exercised guaranteed rights.'" *Bono v. Benov*, 197 F.3d 409, 416 (9th Cir. 1999) (quoting *Wasman v. United States*, 468 U.S. 559, 568 (1984) (holding that the Due Process Clause of the Fourteenth Amendment prevents increased sentences actually

motivated by vindictive retaliation by the judge)).  This claim is apparently based on Petitioner's contention that he was only prosecuted because the prosecutor believed Laurel's story of forcible rape rather than his story that he was a victim of robbery simply because he had previously been convicted of rape and despite the fact that the first jury was unable to reach a verdict at the first trial.  (*See* Pet. at 67-70.)  The state supreme court could have reasonably denied this claim on the basis that Petitioner has identified no constitutional right he exercised which caused the prosecutor to charge him with rape rather than charge Laurel with robbery, nor has he alleged any basis for the decision to bring the charges against him other than a proper exercise of prosecutorial discretion.  *Nunes v. Ramirez-Palmer*, 485 F.3d 432, 441 (9th Cir. 2007) (denying habeas relief where state prisoner failed to set forth "exceptionally clear proof" necessary to overcome the presumption that the prosecutor's discretion was lawful) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987)); *see also United States v. Goodwin*, 457 U.S. 368, 380 (1982) (holding that a defendant must demonstrate that the charges were brought "solely to penalize the defendant and could not be justified as a proper exercise of prosecutorial discretion.")

Petitioner next claims that the trial court violated his rights to due process and to be free from double jeopardy by allowing the information to be amended to allege two strikes arising from the Oklahoma conviction rather than one after the case was submitted to the jury in the second trial.  (ECF No. 43 at 34-49.)  Respondent answers that this claim is without merit because the state court correctly found that Petitioner had ample notice that the Oklahoma conviction constituted two strikes, and that adding new counts on a retrial does not violate double jeopardy principles.  (Suppl. Ans. Mem. at 17-19.)

Petitioner objected at trial that the amendment was untimely and on the basis that jeopardy attached at the first trial.  (RT 983.)  The trial judge found that the defense was in possession of the prior conviction documents prior to the first trial (although at the first trial the prosecutor used a sanitized fax copy in his case in chief), obtained an admission from the defense that there was no particularized prejudice arising from the amendment,

and permitted the amendment based on California Penal Code § 969 which provides a prosecutor with discretion to amend an information to add a prior conviction enhancement before a jury is excused. (RT 983-85.) As quoted above, the state appellate court on direct appeal found there was no due process violation arising from the amendment because Petitioner was on notice that the Oklahoma conviction constituted two offenses, kidnapping and rape. (Lodgment No. 6, *People v. Williams*, No. D06374, slip op. at 19-21.)

Thus, the state court found that the amendment was permissible under state law, and that Petitioner had fair and timely notice that the prosecutor intended to use his prior rape conviction to enhance his sentence. The United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *see also People v. Alvarado*, 207 Cal. App. 3d 464, 478 (1989) (noting that trial courts have discretion to permit amendment to a complaint to allege a prior felony conviction under Penal Code § 969). The state court adjudication of this claim on the basis that amendment was permissible under state law and that Petitioner had adequate notice is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and it is not based on an unreasonable determination of the facts.

Petitioner next contends that his rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment were violated by the introduction of the evidence of his Oklahoma conviction because the narrative of the crime contained false statements and because he was not permitted to confront the person who certified the documentary evidence of the conviction. (ECF No. 43 at 50-53.) As set forth above, the state appellate court addressed a claim on the first direct appeal challenging the use of the narrative of the crime, stating: "Because we conclude the prosecution's narrative was not part of the record of conviction, we need not address defendant's argument that admission of the report violated his constitutional right to confront witnesses." (Lodgment

No. 6, *People v. Williams*, No. D063742, slip op. at 18 n.6.) The claim alleging an inability to cross-examine the person who authenticated the prior conviction documents was raised in Petitioner's *pro se* briefs in the appellate and supreme courts in his second appeal. Respondent contends that the denial of the claim by the state appellate court in the second appeal (on the basis that the issues raised in the *pro se* supplemental brief were fully litigated in the first appeal and are therefore "not now properly before us in this, defendant's second appeal"), means the claim was never properly presented to the state court. (Suppl. Ans. Mem. at 21.) Respondent argues that the claim is technically exhausted because Petitioner no longer has state court remedies available, and it is therefore procedurally defaulted. (*Id.*) Petitioner replies that no default occurred because the state court was properly presented with but evaded review of the claim. (Suppl. Traverse at 27-28.)

The Confrontation Clause does not apply to non-testimonial evidence. *Davis v. Washington*, 547 U.S. 813, 821 (2006). Documents regarding the fact of Petitioner's prior conviction are non-testimonial. *Melendez-Diaz v. Mass.*, 557 U.S. 305, 321 (2005); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (holding that the Confrontation Clause does not preclude admission of records of prior convictions because they are "not testimonial in nature.") Thus, even if the claim was properly raised in the state court, the state supreme court's silent denial of the claim is objectively reasonable because that court could have denied this claim on the basis that the records of the prior conviction were not testimonial. To the extent the claim was not properly presented to the state court, this Court can deny it because it does not raise even a colorable claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005) (holding "that a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim.")

Furthermore, even if the admission of the documents violated the Confrontation Clause because Petitioner was unable to confront the person who certified the records, any

error is clearly harmless for the same reason discussed above why any error in ensuring the documents were properly authenticated is harmless. In light of Petitioner's stipulation at trial that he had been convicted of those crimes, the victim's testimony that the crimes occurred and that she witnessed Petitioner enter a guilty plea, and the sex crimes unit detective's testimony that Petitioner admitted he had served 25 years in prison as a result of his guilty plea, it is clear that any error in admitting the documents without requiring the person who certified them to testify and submit to cross-examination did not have a substantial or injurious effect on the sentencing proceeding. *Brecht*, 507 U.S. at 637-38.

Finally, Petitioner contends the evidence was insufficient to enhance his sentence under the Three Strikes law, and that using the evidence to double his sentence violated federal due process and double jeopardy principles. (ECF No. 43 at 54-63.) As set forth above, Petitioner has failed to allege a federal due process violation arising from the failure to properly plead and prove his prior conviction, and any such violation would amount to harmless error. In addition, the Supreme Court has repeatedly rejected double jeopardy challenges to recidivist sentencing schemes. *See Witte v. United States*, 515 U.S. 389, 400 (1995) ("In repeatedly upholding such recidivism statutes, we have rejected double jeopardy challenges because the enhanced punishment imposed for the later offense is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes, but instead as a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.") (citations and internal quote marks omitted).

In sum, the Court finds that (1) Petitioner should be granted leave to amend the Petition to include the claims raised in the Proposed Amendment; (2) the state court adjudication of those claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings; and (3) any errors are harmless. Accordingly, the Court recommends granting Petitioner leave to amend the Petition to include these claims and recommends denying habeas relief as to the claims.

### D.    Claim Two

Petitioner contends in claim two that the prosecution withheld exculpatory and impeachment evidence by failing to perform DNA testing of the vaginal swabs collected from Laurel and the fingernail swabs and pubic hairs collected from him, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment.") (Pet. at 7, 27-38.)  Respondent answers that the claim is without merit because there was no suppression, destruction, or failure to preserve evidence, all of which was available to the defense for testing, and the silent denial by the state supreme court is therefore neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Ans. Mem. at 15-17.)  Petitioner replies that the prosecutor violated *Brady* by failing to test the evidence.  (Traverse at 7.)

Petitioner presented this claim to the state supreme court in a habeas petition. (Lodgment No. 12 at 8-22 [ECF No. 19-18 at 10-23].)  That court denied the petition in an order which stated: "Petition for writ of habeas corpus denied.  Kruger, J., was absent and did not participate."  (Lodgment No. 13, *In re Williams*, No. S230518, order at 1 (Mar. 9, 2016).)  Petitioner did not present this claim to any lower state court.  This Court therefore must treat the silent denial by the state supreme court as an adjudication on the merits of the claim.  *Richter*, 562 U.S. at 102.  The Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  *Id.*

Mary Beth Sciarretta, a Criminalist with the San Diego Police Department, testified that Petitioner's DNA was found on Laurel B.'s left breast swab, and Laurel's DNA was found on Petitioner's penile swab.  (RT 705-13.)  She testified that she did not submit Laurel's vaginal swabs for DNA testing because she did not observe any sperm cells and therefore "the probability of obtaining any DNA foreign to the victim automatically decreases."  (RT 706-07.)  She testified that only the penile and scrotum swabs from

Petitioner were tested for DNA because judicious use of her laboratory's resources require that she typically will "choose the most probative evidence," which was the penile and scrotum swabs, and the other evidence was not as probative. (RT 708-09.) On cross-examination defense counsel asked Sciarretta why she did not test the other contents of the sexual examination kits, and she answered that the decision was "based on a variety of issues. If we are able to obtain results – we have to choose certain pieces of evidence to test. We can't just test everything. So we choose what we think is the most probative to the case." (RT 717.) She testified that the fingernail swabs and hair samples from Petitioner were less probative than the penile and vaginal swabs, particularly because no semen or sperm cells had been found. (RT 706, 717-18.)

The failure to test evidence by itself does not support a claim for habeas relief. *See Villafuerte v. Stewart*, 111 F.3d 616, 625-26 (9th Cir. 1997) (finding no due process violation arising from the failure to test a semen sample absent a showing of bad faith). Furthermore, Petitioner can demonstrate materiality under *Brady* only if the suppression of the evidence deprived him of a fair trial. *United States v. Bagley*, 473 U.S. 667, 678 (1985); *see Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (holding that prejudice under *Brady* is shown when "there is a reasonable probability of a different result" as to guilt or penalty).

Petitioner has made no showing that the failure to test all the biological evidence affected his trial in any way whatsoever. He contends that the jury questioned the absence of the results because they asked for a read back of Sciarretta's testimony, and speculates that it is impossible to know what evidence might have resulted from the testing. (Traverse at 7.) However, the jury was unable to reach a verdict on count four, rape by a foreign object based on Laurel's testimony that Petitioner placed his finger in her vagina. If his fingernail swab had been tested and revealed Laurel's DNA, the jury might have convicted him of that offense. In fact, defense counsel argued to the jury in closing that the prosecution's failure to test Petitioner's fingernail swab when it could have corroborated Laurel's story constituted a lack of proof. (RT 945-46.) The state supreme court could have reasonably denied this claim on the basis that there is no showing of a reasonable

probability of a more favorable result had Petitioner's fingernail swab or hair been tested. *Richter*, 562 U.S. at 102; *Whitley*, 514 U.S. at 434; *Bagley*, 473 U.S. at 678. Nor is there any basis to find that the state court adjudication of the claim is based on an unreasonable determination of the facts. *Miller-El*, 537 U.S. at 340. Accordingly, the Court finds that the state court adjudication of claim two is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and recommends denial of this claim.

**E.    Claim Three**

Petitioner contends in claim three that insufficient evidence exists to support his convictions for forcible rape and forcible oral copulation because the jury found the knife use allegation not true, because the sex acts occurred after any physical violence took place, and because Laurel's trial testimony diverged somewhat from her statements to the police, the examining nurse, and her testimony at the first trial and the preliminary hearing. (Pet. at 8, 56-64; Traverse at 2-10.) Respondent answers that there was other evidence which supported the jury's finding that Petitioner committed the offenses with the use of force other than with the use of a knife, and that a challenge to Laurel's credibility is not cognizable on federal habeas. (Ans. Mem. at 18-20.)

Petitioner presented this claim to the state supreme court in a habeas petition. (Lodgment No. 12 at 23-35 [ECF No. 19-18 at 25-37].) That court denied the petition in an order which stated: "Petition for writ of habeas corpus denied. Kruger, J., was absent and did not participate." (Lodgment No. 13, *In re Williams*, No. S230518 order at 1.) Because Petitioner did not present this claim to any lower state court, this Court must treat the silent denial by the state supreme court as an adjudication on the merits of the claim, and "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Richter*, 562 U.S. at 102.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which

he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. The Court must apply an additional layer of deference in applying the *Jackson* standard. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," not as a means of error correction. *Richter*, 562 U.S. at 103 (quoting *Jackson*, 443 U.S. at 332 n.5).

There is no merit to Petitioner's contention that insufficient evidence was presented at trial to support the jury's verdicts simply because the jury returned a not true finding on the knife use allegation, or because all of the physical violence testified to by Laurel occurred prior to the sexual assault. Rather, Laurel's testimony provided sufficient evidence that Petitioner used force or fear to make her submit to the sex acts for which he was convicted. She testified that immediately after she declined his offer to pay to perform oral sex on her, she gathered her things and told him she was leaving, but "he turned really aggressive" and "push[ed] me and kept me from getting to the door." (RT 559.) When asked what he did to prevent her from leaving, she testified: "He reached into a drawer and pulled out something I think was a knife. My memory is kind of blurry. But he held something to my throat and – and told me I wasn't leaving, and I started to realize I was trapped." (*Id.*) She testified that Petitioner put the thing that she thought was a knife away, and then offered her the option of leaving, "but when I said I wanted to leave he hit me . . . . He punched my face with his fist . . . a few times." (RT 561.) She testified that she thereafter submitted to his requests to orally copulate him and to place his penis and fingers in her vagina because she believed had she refused he would carry through on his threats to hurt or kill her and to tell the Hell's Angels where she lived. (RT 564-68.)

The jury was instructed that in order to find Petitioner guilty of forcible rape or forcible oral copulation, they were required to find that Petitioner had sexual intercourse or oral copulation with Laurel, that Laurel did not consent, and that he accomplished the

oral copulation or intercourse by force, violence, duress, menace or fear of immediate and unlawful bodily injury.  (RT 885; CT 72-75 [ECF No. 29-5 at 78-81].)  The jury was instructed that intercourse or oral copulation "is accomplished by force if a person uses enough physical force to overcome the other person's will," and "is accomplished by fear if the woman is actually and reasonably afraid, or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it."  (RT 886; CT 73-75 [ECF No. 29-5 at 79-81].)  Laurel's testimony that she submitted to the sex acts due to the force Petitioner used and his threats which she took seriously adequately established each of the elements of forcible rape and forcible oral copulation as those elements are defined by state law.  *See Jackson*, 443 U.S. at 324 n. 16 (holding that federal habeas courts must analyze *Jackson* claims "with explicit reference to the substantive elements of the criminal offense as defined by state law.")  Petitioner's allegation that the force element was not satisfied because the jury returned a not true finding on the knife use allegation, or because the sex acts occurred after he held a knife to Laurel's throat and punched her in the face, ignores the evidence of his ongoing threats and the atmosphere of fear Laurel testified they created. *See Coleman v. Johnson*, 566 U.S. 650 ___, 132 S. Ct. 2060, 2065 (2012) ("The jury in this case was convinced, and the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality.")

Petitioner is not entitled to relief based on his argument that Laurel was not a credible witness because her trial testimony diverged in minor ways with her prior testimony and her statements to the police and the nurse.  (Pet. at 57-59; Traverse at 8.)  An examination of Laurel's credibility is not an appropriate inquiry under *Jackson*.  *See Jackson*, 443 U.S. at 319 (federal habeas courts must respect the "factfinder's province to determine witness credibility, resolve evidentiary conflicts, and draw reasonable inferences from proven facts" by assuming "the trier of fact resolved all such conflicts in favor of the prosecution.")

In light of the additional layer of deference required under the *Jackson* standard, *see Juan H.*, 408 F.3d at 1274, and the admonition that federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply

15-CV-2576-AJB(WVG)

as a means of error correction, *Richter*, 562 U.S. at 103, it is clear that the state supreme court could have reasonably denied claim three on the basis that sufficient evidence was presented at trial to support Petitioner's convictions. The Court finds that the state court adjudication of claim three is neither contrary to, nor involves an unreasonable application of, clearly established federal law. *Richter*, 562 U.S. at 102; *Jackson*, 443 U.S. at 324; *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274. Nor is there any basis to find that the state court adjudication is based on an unreasonable determination of the facts. *Miller-El*, 537 U.S. at 340. This Court recommends denial of this claim.

**F.    Claim Four**

Petitioner contends in claim four that he received ineffective assistance of counsel because his trial counsel (1) failed to obtain Petitioner's cell phone records, surveillance video from the gas station or other businesses near the parking lot, or interview employees of those businesses; (2) failed to raise a vindictive prosecution defense; (3) wished to call as character witnesses only women Petitioner had dated and had consensual sex with rather than women he had helped when they were vulnerable and did not take advantage of; (4) failed to challenge the prosecution's failure to test all of the biological evidence as alleged in claim two; and (5) failed to seek dismissal based on the jury's not true finding on the knife use allegation as alleged in claim three. (Pet. at 66-72.)

Respondent answers that this claim is without merit because defense counsel was not deficient in any of those respects and because Petitioner was not prejudiced by any of counsel's alleged failures. (Ans. Mem. at 20-24.) Respondent contends that the silent denial of this claim by the state supreme court is therefore neither contrary to, nor involves and unreasonable application of, clearly established federal law. (*Id.*)

Petitioner presented this claim to the state supreme court in a habeas petition. (Lodgment No. 12 at 36-45 [ECF No. 19-18 at 39-48].) The petition was summarily denied. (Lodgment No. 13, *In re Williams*, No. S230518 order at 1.) Because this claim was not presented to any lower state court, this Court must treat the silent denial by the state supreme court as an adjudication on the merits of the claim, and "must determine

15-CV-2576-AJB(WVG)

what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Richter*, 562 U.S. at 102.

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Baylor v. Estelle*, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that *Strickland* "has long been clearly established federal law determined by the Supreme Court of the United States"). For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner must establish both deficient performance and prejudice to establish ineffective assistance of counsel. *Id.* at 687.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Ky.*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 686).

Petitioner first contends that his appointed counsel did not conduct an adequate pre-trial investigation because counsel refused to obtain the surveillance video from the Ocean Beach gas station or any of the businesses near the parking lot, or obtain statements from employees of those businesses. (Pet. at 68-69.) He contends those records could have shown that the RV left for the gas station and returned to the parking lot between 3:45 and 4:00 a.m. (*Id.*) Petitioner contends that this evidence could have been used to refute Laurel's testimony that she escaped from the RV about 7:00 a.m. with $1,699 of his money, when (according to Petitioner) she in fact left between 4:30 and 5:00 a.m. with $2,430 of his money, which gave Laurel two hours to confer with Stacy and decide what to do to avoid being charged with robbery. (*Id.*; Traverse at 11-15.)

Assuming the truth of Petitioner's allegation, that he drove the RV to the gas station for cigarettes and returned to the parking lot about 3:45 and 4:00 a.m., there is no showing that video surveillance evidence or eyewitnesses to those acts would have challenged Laurel's timeline testimony. Laurel testified that Stacy left the RV "maybe" about 3:30 or 4:00 a.m., but said she did not "know for sure." (RT 551.) Stacy testified that she (Stacy) left the RV about 4:00 a.m., and that Laurel came home about "7:30-ish." (RT 604-06.) Laurel testified that when the police did not arrive right away after Stacy called them, Laurel called 911 herself because she was afraid Petitioner would get away. (RT 572.) Officer Gustafson testified that he was dispatched to Laurel and Stacy's house at 8:08 a.m. (RT 627.) Petitioner has not demonstrated how video or eyewitness evidence proving that the RV went to the gas station and returned to the parking lot between 3:45 and 4:00 a.m. would have impeached Laurel's trial testimony. His speculation that video surveillance tapes from, or employees of, nearby businesses, assuming they existed and assuming the employees of those businesses were at work, could support his contention that Laurel left the RV between 4:30 and 5:00 a.m. rather than around 7:00 a.m., does not provide a basis to grant habeas relief. Speculative and conclusory allegations are insufficient to prove that counsel provided ineffective assistance. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

15-CV-2576-AJB(WVG)

Petitioner next claims that counsel should have obtained his cell phone records in order to show that Laurel programmed his number into her cell phone and then called his phone to confirm. (Pet. at 69.) He contends this evidence could have been used to argue to the jury that Petitioner had a way of finding Laurel and thereby refute the prosecutor's closing argument to the jury where "the prosecutor continuously inferred that the Petitioner had no way to find Laurel or Stacy, so why would they have to get the Petitioner arrested and out of the way?" (*Id.*; Traverse at 11.)

The state supreme court could have reasonably rejected this claim on the basis that Petitioner failed to show his trial counsel was deficient in failing to obtain the cell phone records. Assuming Petitioner informed counsel that his phone records would have shown Laurel programmed his number into her phone, counsel could have asked that of Laurel at trial, rather than rely on phone records, if counsel thought the jury should be informed that Petitioner had a way of finding Laurel. In light of Laurel's testimony that Petitioner said he was going to tell the Hell's Angels how to find her in order to scare her into staying with him and submitting to sex, it could be considered reasonable trial strategy for defense counsel to forgo pointing out to the jury that Petitioner could track Laurel down with her phone number, which he had in any case obtained through the same ruse he had used to get her into his RV to rape her. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."); *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009) (holding that a petitioner must overcome a "heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.")

The state supreme court could also have reasonably rejected this claim on the basis that Petitioner had failed to demonstrate prejudice. *See Strickland*, 466 U.S. at 687 (both prejudice and deficient performance must be shown in order to establish constitutionally ineffective assistance of counsel). Defense counsel argued to the jury that if Petitioner had awoke and called the police to report a robbery before Laurel had called the police to report

47

a rape, she would have been the one arrested, and that it was unfair to convict Petitioner simply because he overslept that morning. (RT 947.) The jury was able to draw a reasonable inference that Laurel intended to keep the money she took from Petitioner, even after accusing him of rape, in that she did not mention the money to the police until she was asked by the police an hour and a half after they first contacted her if there was anything in Petitioner's pants she took from the RV. (RT 640-45.) Petitioner has not shown a reasonable probability that the result of the proceeding would have been different had counsel brought out at trial that Petitioner knew how to find Laurel through her phone number and therefore Laurel had a motive to be the first to call the police in order to protect herself from being accused of robbery. *Strickland*, 466 U.S. at 694; *Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.")

Petitioner next claims that counsel was deficient in failing to raise a claim of prosecutorial vindictiveness based on the prosecution's assumption that Petitioner was guilty of rape rather than a victim of robbery simply because he had been previously convicted of rape in Oklahoma. (Pet. at 70.) As set forth above, a vindictive prosecution claim is without merit because Petitioner has identified no constitutional right he exercised which caused the prosecutor to charge him with rape rather than charge Laurel with robbery, nor any other basis for the decision to bring the charges against him other than a proper exercise of prosecutorial discretion. *Nunes*, 485 F.3d at 441 (denying habeas relief where state prisoner failed to set forth "exceptionally clear proof" necessary to overcome the presumption that the prosecutor's discretion was lawful) (quoting *McCleskey*, 481 U.S. at 297); *Goodwin*, 457 U.S. at 380 (holding that a defendant must demonstrate that the charges were brought "solely to penalize the defendant and could not be justified as a proper exercise of prosecutorial discretion.") The state supreme court could have reasonably denied this claim on the basis that Petitioner had demonstrated neither deficient performance nor prejudice.

Petitioner next claims counsel was deficient in failing to find and call as character witnesses women he had helped and did not take advantage of when they were vulnerable.

15-CV-2576-AJB(WVG)

(Pet. at 70.) He identifies those witnesses as two "women in need of shelter and food," and a "woman who assisted me in helping the other two women," all while he was assisting a local church in handing out water and sack lunches to the homeless. (Traverse at 26.) Petitioner contends defense counsel only wanted to call women whom Petitioner had dated or had sex with as character witnesses, despite the fact that Petitioner only knew of two such women, who could in any case only be located through his cell phone records which counsel had failed to obtain because their contact information had been deleted from his phone. (Pet. at 68-70; Traverse at 26.)

Even assuming the three women identified by Petitioner could have been located, either with his phone records or otherwise, and assuming the trial judge would have allowed such witnesses to testify, at best it constituted evidence that Petitioner did not rape every woman he met, and at worst it would have opened the door to the prosecution to challenge Petitioner's character. Petitioner has not overcome the strong presumption that the decision by trial counsel not to find and call those witnesses, assuming they could be found, was sound trial strategy. *See Strickland*, 466 U.S. at 680 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") Neither has he shown prejudice arising from counsel's failure to find those women and have them testify at trial, or the failure to find and have testify the two women with whom Petitioner indicates he had engaged in non-violent sex. *Id.* at 694. The state supreme court could have reasonably denied this claim on the basis that, in light of the testimony of the two women Petitioner was convicted of raping, there is no reasonable probability that testimony from women who had non-forcible sex with Petitioner in his RV, or testimony from women who Petitioner handed out water and sack lunches without raping them, would have affected the jury verdict.

Finally, Petitioner alleges defense counsel failed to challenge the prosecutor's failure to test the biological evidence as alleged in claim two and failed to file a post-verdict motion to dismiss based on the jury's not true finding on the knife use allegations as alleged in claim three. (Pet. at 71-72.) As set forth above, those underlying claims are without

49

merit. The state supreme court could therefore have reasonably denied this aspect of claim four on the basis that Petitioner had failed to demonstrate deficient performance or prejudice as a result of trial counsel's actions in this regard.

In sum, the Court finds that the state supreme court could have reasonably denied claim four on the basis that Petitioner had failed to allege facts which, if true, demonstrated deficient performance of trial counsel or prejudice as a result. *See Richter*, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.") (quoting *Strickland*, 466 U.S. at 686). Accordingly, the Court finds that the state court adjudication of claim four is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and thus recommends denial of this claim.

## G. Claim Five

Petitioner contends in his final claim that he received ineffective assistance of appellate counsel for not raising the claims presented here, other than claim one, and for failing to raise a claim based on trial counsel's failure to object to the untimely amendment of the information to allege that the Oklahoma rape conviction constituted a second strike. (Pet. at 10, 74-76.) Respondent answers that Petitioner has shown neither deficient performance by appellate counsel nor prejudice as a result of failing to raise claims that so obviously lack merit, and that the silent denial of the claim by the state supreme court is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Ans. Mem. at 24-25.)

Petitioner presented this claim to the state supreme court in a habeas petition. (Lodgment No. 12 at 46-49 [ECF No. 19-18 at 50-53].) That court denied the petition in an order which stated: "Petition for writ of habeas corpus denied. Kruger, J., was absent and did not participate." (Lodgment No. 13, *In re Williams*, No. S230518 order at 1.) Because Petitioner did not present this claim to any lower state court, this Court must treat the silent denial by the state supreme court as an adjudication on the merits of the claim, and "must determine what arguments or theories . . . could have supported the state court's

decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Richter*, 562 U.S. at 102.

Appellate counsel's failure to raise claims on appeal which, for the reasons discussed throughout this Report, lack merit and was neither deficient nor prejudicial. *See Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) (explaining that the *Strickland* standard applies to claims of ineffective assistance of appellate counsel); *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance); *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable.")

With respect to Petitioner's claim that appellate counsel was deficient in failing to raise a claim alleging trial counsel failed to object to amendment of the information to charge two strikes arising from the Oklahoma conviction rather than one, trial counsel did in fact object to the amendment on the basis that it was untimely and that it violated double jeopardy coming after the previous mistrial. (RT 981-85.) The prosecutor argued that because there had been a mistrial at the guilt phase of the first trial, and the prior conviction allegations had been bifurcated in the first trial, there had never been a trial on the prior convictions. (RT 983-84.) Because a ruling on the issue was unnecessary unless the jury found Petitioner guilty, the trial judge tabled the issue until the jury sent a note indicating they had reached a verdict, at which point, before the verdicts were taken, the judge overruled the defense objections on the basis that California Penal Code § 969 allowed the prosecutor to amend the information to add a prior conviction enhancement at any time before a jury is excused. (RT 985.) The state supreme court could have reasonably denied this aspect of claim five on the basis that appellate counsel was not deficient in failing to raise a claim that trial counsel failed to object to the amendment because trial counsel did in fact object. The state court could have also reasonably denied the claim on the basis that Petitioner was not prejudiced by appellate counsel's failure to raise the claim because the

objection was properly overruled.  *See Alvarado*, 207 Cal. App. 3d at 478 (noting that trial courts have discretion to permit amendment to allege a prior felony conviction before the jury announces a verdict).

In sum, the state supreme court could have reasonably denied claim five on the basis that Petitioner had failed to allege facts which, if true, demonstrate deficient performance of appellate counsel or prejudice as a result.  Accordingly, the Court finds that the state court adjudication of claim five is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and thus recommends denial of this claim.

**H.      Evidentiary Hearing**

The Court recommends denying Petitioner's request for an evidentiary hearing because, as discussed above, even assuming Petitioner's allegations are true, the state court record provides an adequate basis to adjudicate his claims.  *See Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994) (holding that an evidentiary hearing is not necessary where the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief).

**IV.      CONCLUSION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, (2) granting Petitioner leave to amend the Petition to include the claims presented in the Proposed Amendment to the Petition [ECF No. 43], and (3) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **October 6, 2017**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **November 3, 2017.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those

1  objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th
2  Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).
3  DATED:  August 18, 2017

Hon. William V. Gallo
United States Magistrate Judge

15-CV-2576-AJB(WVG)